IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | |
|---|---|
| RONTALD W. FIALKOVICH,<br>  Plaintiff, | )<br>) Civil Action No. 10-1489<br>) |
| vs. | ) Chief Magistrate Judge Lisa P. Lenihan<br>) ECF No. 19 |
| DUQUESNE CITY SCHOOL DISTRICT and<br>ALLEGHENY INTERMEDIATE UNIT,<br>  Defendants. | )<br>)<br>) |

**MEMORANDUM OPINION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I. Conclusion**

The Motion for Summary Judgment filed by Defendants Duquesne City School District ("Duquesne School") and Allegheny Intermediate Unit ("AIU") (hereinafter collectively "Defendants"), in this (a) Constitutionally-protected speech and (b) State law wrongful discharge action filed by a police officer formerly employed by the above-name school district will be granted, as the record presents no genuine issue of material fact and the Defendants are entitled to judgment in their favor, as more fully set forth below.

## II. Factual and Procedural History

Duquesne School is a single building facility previously operating as a Grades K-12 school, and a "distressed school district" which, as a result, is managed by AIU in accordance with a 2007 Intergovernmental Agreement between Defendants and the Pennsylvania Department of Education (the "DOE").[1] It is also operated under the auspices of a DOE-appointed Board of Control. Effective with the 2007-2008 school year, Duquesne School ceased operation as a high school and its enrollment was reduced to Grades K-8. The prior principal was replaced, effective September 2008, with Davaun Barnett ("Principal Barnett").

Plaintiff ("Fialkovich") was employed by Duquesne School from approximately 2005 or January, 2006 through June, 2009, initially as a part-time and then as a full-time member of the school's police force. His employment, and that of the other three (3) full-time Duquesne School police officers (including the Chief of the Duquesne School police force, Chief Hicks), was pursuant to a one-year renewable contract expiring each June 30th. During his initial employment, Plaintiff and other school police officers carried guns in the school building, issued students criminal citations (for, *e.g.*, fighting, tumultuous behavior, harassment, use of tobacco on premises), attended criminal hearings before the local magistrate, and assisted teachers with student discipline incidents.

In 2008, upon Duquesne School's cessation as a high school and restriction of its student population to younger students, *i.e.*, Grades K-8, and under the direction of new Principal Barnett,

---

[1] See Complaint at para. 12 (stating that AIU "was appointed to oversee the finances and to direct and manage the administration personnel of the Defendant School District"). As Defendants' Motion will be granted in its entirety on other grounds, the Court need not address Defendants' observation that, under the terms of the Intergovernmental Agreement, the police officers remained employees of Duquesne School. See Defendants' Brief in Support of Motion for Summary Judgment (hereafter "Defendants' Brief in Support") at 2 n. 2; id. at 14 (asserting that wrongful discharge claim against AIU should be dismissed as it was never Plaintiff's employer).

police officers stopped carrying guns in the school building.[2] They were also directed to

consult/notify Principal Barnett prior to issuing a citation to and arresting a student. See

Complaint at para. 14.

The police officers continued to write citations throughout the school year, without

advance notice to or consultation with Principal Barnett or other school administration.[3] Chief

Hicks communicated that he felt the request was an improper infringement on the officers'

authority and duty to uphold the law.[4] In April 2009, Principal Barnett directed erection of a "no

parking" sign across the street from the elementary entrance to the school, where Plaintiff had

previously parked his vehicle – with school permission and placard –[5] assertedly to facilitate

---

[2] Defendants aver that the officers were prohibited from continuing to carry guns in the school and directed to secure them during the school day. Plaintiff denies this assertion and avers that Chief Hicks recommended they be "locked up". Compare Defendants' Concise Statement of Material Facts at 5 with Plaintiff's Counterstatement of Facts at 3.

[3] See Complaint at para. 15 ("Mr. Barnett was advised by Chief Joseph Hicks that he would not adhere to this 'directive' from Mr. Barnett, because he did not want to jeopardize the safety of the staff, students or officers prior to seeking an arrest while a physical confrontation was ensuing."). Compare Appendix at A.288 (April 16, 2009 Memo from Principal Barnett to School Police advising of call from parent of 5th Grade child criminally cited for disorderly conduct, without notice to school administration, and directing that "[c]itations will be written after a student has received due process by a Duquesne City School District administrator"); id. (further explaining administration guidelines, including that "[a]ll drug and weapon violations will be cited" and that "an administrator may request that a citation is issued to a student after multiple infractions of the student code of conduct" such as recurrent involvement "in a fight").

[4] Appendix at A.271 (Undated communication from Chief Hicks stating that in November, 2008 he informed Principal Barnett that "no Police Chief has the authority to exclude or refrain his personnel from issuing citations because police officers are empowered by law to do so" and warned Principal Barnett of "possible criminal charges" if the school "continued to harass [Hicks'] staff when we issue citations"); id. (asserting Hicks' opinion that "as a sworn police officer we do not have to have permission from no one, not one person to make an arrest or to issue citations" according to law which cannot "be superseded by school policies" and that "Mr. Barnett does not honor our role, law enforcement powers nor does he honor our authority in this school district"); see also Appendix at A.325 (Plaintiff's deposition testimony that Barnett's request that police inform him before a citation was issued interfered with his ability to do his job as a school police officer because "If a citation is going to be issued, it's going to be issued. I don't have to have a second guess of my job description . . ."); id. ("[Barnett] don't [sic] supersede Commonwealth of Pennsylvania laws . . ."). Cf. Plaintiff's Counterstatement of Facts at 4 (citing "Chief Hicks' letter stat[ing] that he hoped to include school administration in all decisions but could not, by law, instruct his officers not to issue citations when they had the legal authority to do so"); cf. also Defendants' Concise Statement of Material Facts at 6 (citing Chief Hicks' communication to William Addy, Director of Human Resources at AIU, stating that Principal Barnett "can't be my boss, and I can't be his").

[5] See Complaint at para. 17-19.

3

dismissals.[6] Plaintiff failed to comply with Principal Barnett's request(s) that he remove his car from that location, and has indicated that he was "engaged in the performance of his job at the middle school, and was unable to comply with this directive".[7] Plaintiff was not disciplined but was called to a meeting with Principal Barnett and Chief Hicks, which "quickly deteriorated into a verbal disagreement between Mr. Barnett and Officer Fialkovich". By letter of that same date, Plaintiff was advised that he "was instructed to comply with all expressed and implied directives given by the administration" and "[a]ny willful disregard or refusal . . . will be interpreted as insubordination . . . subject to disciplinary action including but not limited to suspension or termination."[8] The record reflects other disagreements of opinion between the police officers and Defendants.[9]

During this period, Chief Hicks communicated with the school administration regarding his disagreements with Principal Barnett and with changes the administration was attempting to implement regarding the role of the police force in the now Grades K-8 school. Multiple e-mail communications documenting Chief Hicks' objections to the changes in police parameters, and

---

[6] It was subsequently determined that the school lacked authority to post the no parking designation and the sign was removed.

[7] See Complaint at para. 24; see also Plaintiff's Counterstatement of Facts at 4 (stating that Plaintiff "did not refuse to move his car, but was unable to do so because of work obligations"). Cf. Plaintiff's Brief in Opposition at 8 (averring that Principal Barnett posted no-parking signs "without asking Mr. Fialkovich for permission and without explaining the rationale to Mr. Fialkovich").

[8] See id. at para. 26-28; Appendix at A.281 (also observing that "[i]t is not in the best interest of the Duquesne School District for any employee to decide if they should or should not follow the request of administration or policies of the district").

[9] The officers made a 2008 request for a police vehicle, which was denied. Defendants also aver that Plaintiff made a 2009 request for body armor, a bullet-proof vest and gun, which was denied. Plaintiff disputes that he made a request other than for reimbursement "for items related to his uniform", although "it appears as though the school officials refused to purchase body armor, a holster or a gun for Plaintiff." Compare Defendants' Concise Statement of Material Facts at 5 with Plaintiff's Counterstatement of Facts at 3. Cf. Appendix at A.327 (Plaintiff's deposition testimony that "whole police force" made a request for body armor or a bullet-proof vest).

4

school policy/philiosophy, are of record.[10] On April 3, 2009, Chief Hicks emailed Superintendent Cheryl Fogarty ("Superintendent Fogarty") informing her that he had contacted Stephen Zapalla, the Allegheny County District Attorney (the "Allegheny County DA's Office") regarding his objections to Duquesne School's restrictions on his law enforcement authority and assertedly improper motives.[11]

---

[10] See, e.g., Appendix at A.272 (undated communication from Chief Hicks advising that "[s]chool police officers have been given the power and authority by law, to arrest, enforce good order . . . . We also are empowered through legislation to issue citations and have the same municipal police powers as any other police agency in this [C]ommonwealth. To simply [sic] it, we are no different than any other police agency or department in Pennsylvania. Additionally, totally apart from our law enforcement powers we have been given the same disciplinary authority over students that have [sic] been given to principals and assistant principals. So it comes to no surprise, I have been in contact since late last year with a 'higher' outside agency . . . Mr. Barnett can not supervise those who have been sworn to uphold the law . . . . That is why police departments have a police chief . . . . I have run out of options and I have expired my patience. Instead of Mr. Barnett working alongside me, he instead chooses to work above us and above the law. If Mr. Barnett is not controlled and a resolution can not be reached . . . then I will have no other option but to forward my documents . . . to [the District Attorney]."); A.286-287 (undated communication from Chief Hicks to Director of Human Resources for AIU, noting that "[t]he predecessors of the Barnett administration has [sic] never come up against attempted to overrule the police . . . . From my professional experience, the current administration . . . wihes to control, supervise or otherwise overrule the personnel who have been sworn under oath to uphold the laws of Pennsylvania and the United States with fidelity. The administration cannot supervise those who have been sworn to enforce Federal, State and Local Laws because they do not possess the required knowledge to do so. As a Police Chief, I am highly decorated and viewed by the courts as a leader, supervisor or boss . . . . The administration continues to 'do it their way' and it leads to verbal disagreements between us. . . . . To the administration it is about projecting power or being the only voice or authority in the building. Instead of being incorporated into the school police department, they wish to control it.").

[11] See Defendants' Brief in Support at 6 & n. 3 (explaining that Superintendent Fogarty was employed by the AIU and served as Superintendent of Record pursuant to the Intergovernmental Agreement); id. (noting that Chief Hicks provided a copy of his letter to the Allegheny County DA's Office by email to Superintendent Fogarty).

See also A.276-77 (communication from Chief Hicks to Dr. Fogarty, advising that meeting of February 24, 2009 was "a complete failure" and he had "attempted to explain to you that as an 'accredited police department' in this [C]ommonwealth, we are to be considered a 'separate sovereignty' because there is [sic] state laws that we are sworn by oath to uphold but the [D]istrict believes that they [sic] can overrule or ignore these laws and our authorities . . . .[Y]ou think you can overrule or question a police related incident and attempt to supervise police officers the way that you see it? Well as a high ranking official in the eyes of the courts I will no longer entertain it. . . . During my tenure here at the district my voice was always heard and it was a voice that was more important than any others regarding school climate and safety."); id. ("I have been in touch with the Allegheny County District Attorney's Office over the past several weeks and I have uncovered a 'host' of criminal violations and student rights violations and I provided all the relevant and pertinent information and a compilation of other evidence . . . to the DA's Office . . . . I have also already had a scheduled meeting with the [District Attorney's Office] and have forwarded all pertinent information on school fact finding prima fascia [sic]. . . . I believe that I have expired [sic] all available options and resources and the issues has [sic] been referred to a 'higher authority' namely the . . . District Attorney's Office . . . .").

Cf. Complaint at para. 32 (asserting that Principal Barnett's "job performance rating was based, inter alia, upon statistics showing that the rate of violence had decreased").

5

Plaintiff and the other police officers were informed in May, 2009 that their contracts would not be renewed.[12] Defendants aver, and Minutes of the meeting with representatives of Defendants and the Board of Control reflect, that Plaintiff and the other police officers were advised they were not re-employed because of differences of opinion regarding the best approach to student discipline in an elementary/middle school building (*e.g.*, a reactive, armed police presence focused on issuance of citations and arrests vs. a more proactive, postive-reinforcement approach going forward)[13] and cost considerations. The four (4) officers were replaced with two (2) private firm security guards who, unlike the police officers, do not have the power to issue criminal citations or arrest students.[14]

Plaintiff alleges that his Constitutionally-protected rights were violated when Defendants retaliated against him in response to Hicks' complaints to the Allegheny County DA's Office alleging that Defendants were (a) constraining the school police force in a manner which improperly interfered with/impeded their rights and duties as law enforcement officers, and (b) improperly motivated by an intention to (i) reduce the number of incidents reportable under Pennsylvania statutes intended to promote school safety, and (ii) create a false appearance of improved school environment/safety. Count I of Plaintiff's Complaint is brought under 42 U.S.C. Section 1983, for First and Fourteenth Amendment violations, and quite succinctly alleges violations arising from "terminat[ion] in retaliation *for his exercise of his right to speak on matters*

---

[12] Although Board of Control meetings were held, and the issues discussed, in February or March, 2009, there are no notes of that decision-making process of record. Cf. Defendants' Concise Statement of Material Facts at 9; Plaintiff's Counterstatement of Facts at 7-8.

[13] Cf. Plaintiff's Counterstatement of Facts at 7 ("At the beginning of the 2008-2009 school year, Principal Barnett began to put together a plan to teach 'red flag' students about proactive behavior.").

[14] See Complaint at para. 46.

*of public concern.*" See Complaint at para. 49-50 (emphasis added).

Plaintiff further alleges, in Count II of his Complaint, that the non-renewal of his annual contract constituted a "wrongful discharge" – without further elaboration – because he was "discharged . . . in order to reduce the mandated reporting of incidents" within the School Safety Act and, accordingly, in violation of the public policy underlying the Safe Schools Act. See id. at para. 54-55.

Presently pending is Defendants' Motion for Summary Judgment.

### III. **Summary Judgment Standard**

Summary judgment is to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or speculations to support his claim. The nonmoving party "must do more than simply show that there is some

7

metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. See Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992). One of the principal purposes of the summary judgment rule is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

**IV.     Analysis**

    **A.    Count I - Free Speech – First and Fourteenth Amendments**

The parties correctly agree (1) that to prevail on his § 1983 claim of retaliation for protected speech, Plaintiff must proffer sufficient evidence that (a) he engaged in constitutionally-protected conduct/speech on matters of public concern, and (b) the protected conduct was a substantial factor in the alleged retaliatory termination; and (2) that whether particular conduct is protected under the First Amendment is a question of law.   See Defendants' Brief in Support at 4 (citing Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 498 (3d Cir. 2002); Plaintiff's Brief in Opposition at 2 (citing Hill v. Borough of Kutztown, 455 F.2d 225, 241 (3d Cir. 2006)); see also Matsey v. Westmoreland County, 185 F.App'x 126, 132 (3d Cir. 2006)). Plaintiff's proffer of sufficient evidence would then shift the burden to Defendants to show that the action would have been taken absent the protected conduct.   See, *e.g.*, Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006).

As its first ground for grant of summary judgment as to Count I, the Court observes that Plaintiff's Complaint and both parties' briefs discuss Chief Hick's allegations to the Allegheny County DA's Office. Reading the Complaint in the light most favorable to Plaintiff, the Court will assume that this is the Constitutionally-protected speech underlying Count I's conclusory

8

allegations.[15] As Defendants properly observe, there is no allegation and nothing of record suggesting that Plaintiff participated in Chief Hicks' communication with the Allegheny County DA's Office or made any direct communication of his own to that office, or any public office, or in any public forum.[16] See Complaint at para. 36-37 (asserting that "*Chief Hicks indicated that he had been in contact with the Allegheny County District Attorney's Office, reporting what he believed* to be crimes of Official Oprression, Obstruction of Law and Other Governmental Functions, and Suppression of Crime, *which he believed* to have been carried out and covered up by Mr. Barnett. These allegations were based upon the belief held by members of the Police Department that student crime in [Duquesne School] was being covered up . . . and that the [Defendants] were suppressing the reporting of such crime.") (emphasis added).[17]

---

[15]  See Plaintiff's Brief in Opposition at 3 (identifying "the speech in question" as " a letter from Police Chief Joseph L. Hicks to Allegheny County District Attorney Stephen Zapalla"). Cf. Plaintiff's Counterstatement of Facts at para. 58 (asserting that "as Chief of Police, Chief Hicks spoke for Plaintiff during this meeting"). This latter assertion also appears to refer to Chief Hicks' communication(s) with the Allegheny County DA's Office. See also Plaintiff's Brief in Opposition at 5 (referring to a meeting between Chief Hicks and District Attorney Zappalla).

[16]  Plaintiff does not dispute that he, himself, "had no conversation with Allegheny County District Attorney or his representative, and no involvement in communication with the District Attorney's Office". See Defendants' Concise Statement of Material Facts at para. 58; Plaintiff's Answers to Defendants' First Set of Interrogatories at 14. And Plaintiff admits that there is "no evidence Hicks ever had any further communications with anyone at the District, AIU or the District Attorney's Office regarding any contact with the District Attorney's office" or that "the District Attorney's Office . . . contacted anyone at the School District [or] commence[d] any investigation as a result of Hick's letter"). See Plaintiff's Counterstatement of Facts at para. 55-56. See also infra n. 17.

[17]  There is no evidence of record that, in his communication to the Allegheny County DA's Office, Chief Hicks was acting Christian to Plaintiff's Cyrano, or speaking the accusations, assertions, or beliefs of other than himself. There is no evidence that in corresponding with the District Attorney's Office Chief Hicks was acting as an agent for Plaintiff. On the contrary, the uncontroverted evidence of record indicates that (a) Chief Hicks repeatedly referred to the beliefs and communications in the first person, and (b) Plaintiff concedes that he neither participated in the communication nor was made aware of the contents by Hicks. See Defendants' Brief in Support at 7 (citing correspondence at Appendix A.276); id. (providing record citations to averments that Plaintiff had no input into the contents of Chief Hicks' letter, was not informed of its contents by Chief Hicks, had no conversation with the District Attorney's office, and believed Chief Hicks sent the letter because he was Chief of Police). Chief Hicks' bare recitation that he was writing "on behalf of " his department as well as the President of the Teachers' Union cannot overcome the absence of evidence of agency for the Plaintiff in his individual capacity. Cf. Appendix at A.287 (correspondence of Chief Hicks to AIU explaining that "[s]ince [Officer Fialkovich] is a police officer for the district he has always and will continue to answer to me").

   See generally id. ("I have been in contact with the . . . District Attorney's Office for several weeks now and I have

9

The First and Fourteenth Amendments to which Plaintiff directs this Court provide Constitutional protections for certain speech or other expressive conduct. Thus, the individual with legal standing is the one who exercises his protected rights, *i.e.*, the speaker. These Amendments do not, nor could they, provide a cause of action against any other individual/entity on the basis of beliefs which Plaintiff has not expressed. And neither Plaintiff nor Defendants discuss any authority allowing a cause of action for conduct against a plaintiff allegedly taken in retaliation for a third party's speech (*e.g.*, as a collateral consequence).[18] In the *complete absence* of any allegation in the Complaint, or any evidence of record, of protected speech or other expressive conduct *by Plaintiff* known to a representative of a Defendant and therefore forming a plausible basis for a claim of unconstitutional retaliation, there is simply no genuine issue of material fact.[19] Neither party, nor this Court's independent research, identifies any authority for

---

had several telephone conversations with them and I have also sat down and met with them in person. I have reported crimes of official oppression, obstruction of law and other governmental functions and the suppression of crime that has also been carried out and covered up by Mr. Barnett and I have the proof. Mr. Barnett refuses to work alongside me but instead he wishes to work above me . . . . Since I have authority as a law enforcement officer and . . . then same disciplinary authority over students given to principals and other administrators, then he cannot be my boss and I cannot be his. . . . . [T]he administration believes that a school policy supersedes state laws and they are painfully wrong. The things that have been inappropriately done and the lack of respect for my authority has [*sic*]forced me to seek the assistance of an outside agency. Since he has not and will not listen to me, then I have been forced to bring in someone that he will have to listen to."). Cf. *infra* n. 21.

In addition, despite Plaintiff's assertion that Chief Hicks was speaking for him in reporting allegations of Defendants' interference with police officers' legal authority and statutory violations, Plaintiff avers that he "in no [way] defined the extent of any conflict [bewteen the school police and the AIU], nor was he in a position to testify about the extent of any conflict." See Plaintiff's Counterstatement of Facts at 3. Cf. Complaint at para. 33 ("At all times material hereto there existed a persistent and ongoing conflict beween members of the School Police Department and the Defendant [AIU].")

[18] The limitation of standing to an individual exercising his rights, as a citizen, to expressive conduct reflects an appropriate balance between constraints on government agencies' official action and the protection of Constitutional rights. Cf. City of San Diego v. Roe, 543 U.S. 77, 80-82 (2004) (observing, in recognition of governmental entity's right to impose restraints on employee speech, considerations relating to potential "compromise [of] the proper functioning of government offices"); Connick v. Myers, 461 U.S. 138, 150 (1983) (discussing balancing of value of expressive conduct against "the government's interest in the effective and efficient fulfillment of its responsibilities to the public").

[19] Compare, *e.g.*, Ambrose v. Township of Robinson, Pa., 303 F.3d 488 (3d Cir. 2002) (police officer allegedly

Plaintiff's unique claim.

As a second, independent ground for grant of summary judgment as to Count I, the Court observes that, even if Hicks' speech were regarded, for purposes of Constitutional protection, as Plaintiff's own, the speech alleged in the Complaint was made by Chief Hicks in his official capacity and did not constitute protected public speech within the ambit of the cited Amendments.

A public employee makes a protected statement for purposes of a First Amendment retaliation claim when he (1) speaks as a citizen, (2) involving a matter of public concern, and (3) the employer lacks adequate justification for treating the employee differently from any other member of the general public as a result of the statement. See, *e.g.*, Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006); see also Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) (noting that First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern"). When the employee speaks "pursuant to [his] official duties", he is not speaking as a public citizen for First Amendment purposes, and the Constitution does not insulate those communications. Garcetti, 547 U.S. at 421.

Chief Hicks reported, in his capacity as the Chief of Police of Duquesne School, to the Allegheny County DA's Office, what he purportedly believed to be criminal conduct on the part of the Defendants (*e.g.*, obstruction of justice and intereference with his official duties). He was, in his own view, *protecting and performing his official duties*. This is the tenor of his communication[20] and it is one which does not constitute public speech. See, *e.g.*, Fulmer v. Commonwealth of Pennsylvania, 2011 WL 915846 (W.D. Pa. Mar. 16, 2011) (granting summary

---

suspended in retaliation for providing supportive affidavit for colleague's lawsuit against township).

[20] Chief Hicks' letter was written on his official letterhead, designated "Duquesne City School District Police Department, Joseph L. Hicks, Chief of Police". See Defendants' Brief in Support at 7 (citing Appendix at A.276).

11

judgment for defendants where communications of State Police crime section commander, initiating internal affairs investigation regarding misconduct, constituted speech made in connection with official duties); McNamee v. County of Allegheny, 2007 WL 2331878 (W.D. Pa. Aug. 13, 2007) (granting summary judgment for defendants where long-term care facility's Director of Nursing's "reporting to the Department of Health", an outside agency, and participation in subsequent investigation were within official duties). Compare, *e.g.*, Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (holding that teacher's letter to newspaper criticizing his school district's handling of funds obtained through tax increases was protected speech). Compare generally Garcetti, 547 U.S. at 419 ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.") (citing Perry v. Sindermann, 408 U.S. 593, 597 (1972)).[21]

And even if Plaintiff were to assert that the conclusory allegations of Count I were intended

---

[21] Plaintiff asserts that Chief Hicks' communication to the District Attorney's office was protected because "report[ing] the actions or inactions of school officials to the District Attorney" . . . "did not represent a task that Chief Hicks 'was employed to do'." Plaintiff's Brief in Opposition at 5 (distinguishing Garcetti, 547 U.S. at 421 (deputy district attorney's memo to district attorney questioning viability of search warrant was within his job duties to communicate with district attorney regarding pending cases).

It is clear from the written record, however, that the crux of the ongoing disagreement between Chief Hicks and Defendants turned on the former's conviction that (a) the scope and authority of his official duties as Chief derived from law enforcement powers invested in him by the State and (b) this investiture preempted any asserted modifications to those authorities/duties by Defendants. And it is clear that Chief Hicks was reporting perceived improper/impermissible infringements to the District Attorney (*i.e.*, to higher State law enforcement authority) in his official capacity and not as a private citizen. Cf. Armbruster v. Cavanaugh, 2010 WL 816385,*4 (E.D.Pa. Mar.9, 2010) (observing that when a public employee, such as campus police officer, raises complaints or concerns "up the chain of command regarding job duties or assignments, such speech is undertaken in the course of performing the job"); Baranowski v. Waters, 2008 WL 4000406, at *18 (W.D.Pa. Aug.25, 2008) (noting that formal job description does not determine whether speech is outside scope of employee's duties); Connick v. Myers, 461 U.S. 138, 147–48, (1983) (noting that protected nature of speech is determined by the "content, form, and context . . . as revealed by the whole record"). Compare Plaintiff's Brief in Opposition at 5 (asserting that Defendants failed to present a credible argument that communication with District Attorney was "pursuant to the official duties of Chief Hicks, Mr. Fialkovich or any of the individual officers").

to encompass Chief Hicks' other communications (*i.e.*, internal communications directed to Defendants), as speech conveyed inside the workplace rather than publicly, and concerning matters of employment (*i.e.*, concerning the parameters of what he and school police officers were authorized/employed to do, his official duties), that speech was similarly outside the ambit of the First Amendment. Cf., *e.g.* Garcetti, 547 U.S. at 420-21 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'") (quoting Connick v. Myers, 461 U.S. 138, 147 (1983); id. at 422 (observing that while public "employees retain the prospect of constitutional protection for their contributions to the civic discourse", this "prospect of protection, however, does not invest them with a right to perform their jobs however they see fit"); Miller v. Clinton County, 544 F.3d 542 (3d Cir. 2008); DeLuzio v. Monroe County, 271 Fed.Appx. 193, 196 (3d Cir. 2008).

The nature of Chief Hicks' speech thus presents a second, equally insurmountable, hurdle to Plaintiff's claim that Defendants' failure to renew his employment contract was unconstitutionally retaliatory under the First and Fourteenth Amendments.[22]

### B. Count II - Wrongful Discharge

Plaintiff alleges that the failure to renew his employment contract constituted a wrongful

---

[22] Defendants' extensive assertions that Superintendent Fogarty "was the only individual employed by either Defendant" who knew of Chief Hicks' letter to the District Attorney's office, "only one of the individuals involved in the decision to not renew the contracts of" the police officers, and not "the ultimate decision maker" are misplaced. See Defendants' Brief in Support at 8-12; Defendants' Concise Statement of Material Facts at 7 ("No one else at the School District or the AIU was sent a copy of [Hicks'] communication with the District Attorney nor was anyone other than Cheryl Fogarty even aware of its existence . . . ."). Superintendent Fogarty's knowledge of Chief Hicks' communication and her participation in the decision-making process would suffice within a summary judgment analysis. See **Error! Main Document Only.**Lakeside-Scott v. Multnomah Co., 556 F.3d 797, 801-09 (9th Cir. 2009); Sameric Corp. v. City of Philadelphia, 142 F.3d 582, 593 (3d Cir. 1998); cf. Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 268 (3d Cir.2001).

13

discharge in violation of Pennsylvania public policy under the Safe Schools Act.[23] To succeed on a claim of wrongful discharge (pursuant to the narrow public policy exception to the employment at will doctrine), he must evidence violation of a "clear mandate of public policy."  See, *e.g.*, Lambert v. Environmental Restoration Group, Inc., 2008 WL 723328 (W.D. Pa. Mar. 14, 2008); McLaughlin v. Gastrointestinal Specialist, Inc., 750 A.2d 283 (Pa. 2000). See also Kuzel v. Krause, 658 A.2d 856, 860 (Pa.Commw.Ct. 1995) (quoting Yaindl v. Ingersoll–Rand Co., 422 A.2d 611, 617 (Pa.Super.Ct. 1980)) ("A claim for wrongful discharge is made out when the plaintiff establishes that his or her discharge is a violation of a clearly definable right that 'strikes at the heart of citizens' social right, duties and responsibilities.'").

The Pennsylvania Public School Code, School Safety Act, 24 P.S. Section 13-1301 to 1303, creates an "Office for Safe Schools" within the Department of Education (the "DOE"), and requires that the administrators of public schools within the Commonwealth submit annual reports (a) of incidents involving acts of violence; possession of a weapon; or possession, use or sale of controlled substances, alcohol or tobacco, and (b) including all incidents of conduct constituting a criminal offense within certain cited sections of the Pennsylvania Criminal Code. See 24 P.S. Section 1303(b). The Pennsylvania Courts have recognized a "public policy of protecting students from violence on school property" derived from the School Safety Act. Shamokin Area School Dist. v. Amer. Fed. of State, County and Municipal Employees Dist. Council 86, 20 A.3d 579, 582 (Pa. Comwlth. Ct., 2011).

The Court notes that the statutory provisions address *public school admnistrators' creation and maintenance of particular records.* Neither the Public School Code provisions, nor the

---

[23] The Court observes that Plaintiff's Brief in Opposition addresses only Count I of Plaintiff's Complaint and provides no counter-argument to Defendants' request for summary judgment as to Count II, Wrongful Discharge.

obvious public interest in protecting students from violence on school premises, impose additional requirements beyond those of the Criminal Code regarding when students become subject to reportable criminal sanctions, nor do they constrain public schools' authority or discretion to design, implement and/or manage its disciplinary approaches and procedures. And although the statute refers to consultation with school "security personnel" in the context of an "advisory committee", it requires a Memorandum of Understanding signed by, and a review of the school's annual report by, the "Police Department with jurisdiction over" the school district. 24 P.S. at 1303. Finally, the statute contains provisions for disciplinary action by the DOE (and potential criminal sanctions) against a school administrator who fails to file or falsifies a report, or fails to enter a Memorandum of Understanding with or make required incident reports to, the Police Department with jurisdiction. See id.

Plaintiff's Complaint alleges that "Principal Barnett interfered with the School Police in the performance of their duties, by concealing from them information concerning fights and assaults on students and faculty members" or by advising School Police "that he wanted to be notified before any student was cited and arrested"; or by permitting students to return to school with no sanctions for having violated school policy. [24] As detailed above, the Public School Code

---

[24] See Complaint at para. 34; id. at para. 14 & 16.

But cf. Defendants' Brief in Support at 7 (outlining matters complained of in Chief Hicks' letter as (1) Principal Barnett's request that he have opportunity to contact parents prior to contacting 911 in cases of student injury; (2) failure to expel a student for a weapons violation and failure to report it; (3) Principal Barnett's demand that police officers obtain "permission" before effecting an arrest and establish a procedure for contacting parents of students to be issued citations; (4) AIU's denial of police request for an emergency vehicle; and (5) failure to report a criminal violation) (citing Appendix at A.276-77). No further specificity or evidence regarding the pertinent allegations has been provided of record. See, e.g., Plaintiff's Answers to Defendants' First Set of Interrogatories at 10-13 (requesting identification of evidence regarding concealment of crime); Appendix at A.326-27, 331-34, 338-39 (Plaintiff's deposition testimony as to his general inability to identify specific information sufficient to create genuine issue of fact as to allegations of suppression/concealment); id. at A.333 (testimony as to no knowledge of any investigation or charge arising from Chief Hicks' allegations to the District Attorney); id. at A.335-36, 344-45 (testimony as to general unfamiliarity with reporting or knowledge of whether particular incidents were included in

15

does not speak to a public school's discretionary authority over disciplinary policies/procedures or the scope of employment of particular security personnel. His Complaint allegations notwithstanding, Plaintiff has proffered no evidence that the Defendants failed to create or maintain statutorily-mandated records or annual reports, or that the School District failed to comply with statutory requirements regarding the Police Department of jurisdiction, or – moreover - that the non-renewal of Plaintiff's at-will employment contract was in violation of a clear public policy mandate (*i.e.*, safety in public schools).

As also detailed at length above, the Court's review of the extensive documentation of record in this case reflects policy disagreements regarding the most appropriate role of security personnel at Duquesne School following its transition to a Grades K-8 building, and changes in administration, in 2008.[25] There is no Pennsylvania public policy precluding a school district's decision to retain a private security firm rather than a police force. Indeed, many - particularly elementary and middle - schools do not deem it either necessary or appropriate to retain police officers to maintain order and community safety on school premises. Cf. 24 P.S. Section 1303, *supra* (referencing school "security personnel" and "Police Department" with jurisdiction). The School Chief of Police, and the school police officers, elected to dispute policy changes and disregard administrative direction. Chief Hicks repeatedly communicated his belief that neither he nor the other officers were subject to Defendants' authority. Their contracts were not renewed.

---

district's annual reports).

[25] Cf. Defendants' Brief in Suppport at 11 ("The Board of Control, acting with the Principal and the AIU, made the decision to address student discipline in a more positive, proactive approach . . . . This philosophy did not meet with that of the school police.").

## V. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted. A separate Order will follow.

_____
LISA PUPO LENIHAN
United States Chief Magistrate Judge


Dated: March 28, 2012